IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

GREGORY RAIFORD

     v.

MARYLAND DEPT. OF JUVENILE
SERVICES, et al.

            :
            :
            :    Civil Action No. DKC 12-3795
            :
            :
            :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this disability discrimination case is a motion for summary judgment filed by Defendants the Maryland Department of Juvenile Services and Sam J. Abed, Secretary of the Department of Juvenile Services. (ECF No. 53). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Defendants' motion for summary judgment will be granted.

**I. Background**

    **A. Factual Background**

Unless otherwise noted, the following facts are uncontroverted. On March 10, 2010 Plaintiff Gregory Raiford ("Mr. Raiford" or "Plaintiff") became a Resident Advisor Trainee with the Maryland Department of Juvenile Services ("DJS") at the Cheltenham Youth Facility ("CYF"). (ECF No. 53-8, at 1). The CYF "and the other detention facilities are primarily staffed by

Residential Advisors ("RAs"), whose primary purpose is to provide direct care and supervision to the Department's detained youthful offenders." (ECF No. 53-2 ¶ 2, Deitchman Aff.). On June 21, 2010, Plaintiff injured his left knee while separating youths during a struggle. (ECF No. 53-9). Thereafter, Plaintiff returned to work in a modified or light duty capacity, performing work in the gate house and special duty post, which did not involve contact with juveniles. (ECF No. 53-12, at 3). On November 23, 2010, before Plaintiff had surgery on his knee, his doctor Lorne E. Weeks submitted a letter, stating in relevant part:

> Mr. Gregory Raiford is under the medical care of Lorne E. Weeks, M.D. He is scheduled for surgery on December 10, 2010 and will commence physical therapy 10 days post surgery which will be for approximately 2 ½ - 3 months. Dr. Weeks will evaluate Mr. Raiford monthly with a final evaluation at the end of therapy.
>
> . . .
>
> Anticipated return to work full duty is March 7, 2011. Updated work status and restrictions will be provided on an ongoing basis.
>
> Due to his job responsibilities, Mr. Raiford is to continue light duty until his surgery date with the restrictions of no prolonged standing and/or walking longer than 35 minutes/h[ou]r. Also, in order to prevent further injury to his knee, he is to refrain from involvement in ending any altercation.

(ECF No. 53-10, at 5).

On December 10, 2010, after Plaintiff had surgery on his left knee, Defendants allowed Mr. Raiford to receive accident leave through March 20, 2011, briefly returning to work on March 21, 2011. (ECF No. 53-12, at 3). On March 9, 2011, the Assistant Superintendent sent correspondence to Plaintiff stating, in relevant part: "In accordance with the Accident Leave Policy, you may use work-related accident leave beginning on the first day of disability, and continuing until the day that you are able to return to work, as certified by a physician. Therefore, you will be recommended for work-related accident leave to cover your absences until you are able to return to full duty." (ECF No. 53-11). On March 10, 2011, Dr. Weeks sent further correspondence stating that Plaintiff underwent surgery on December 10, 2010 and "[d]ue to his job responsibilities, he is to continue with light duty with no running, no prolonged standing, and refrain from any steps. Mr. Raiford is to refrain from involvement in ending any altercations." (*Id.* at 6). Plaintiff returned to full duty effective March 21, 2011. (ECF No. 53-10, at 4, 7).

On April 15, 2011, Dr. Weeks recommended that Mr. Raiford be returned to light duty work station. (ECF No. 53-10, at 8). Because Defendants were unable to accommodate modified duty, Mr. Raiford was granted accident leave through May 13, 2011. (ECF No. 53-12, at 3).

On May 5, 2011, Getrude White, Residential Group Life Manager II, submitted correspondence to the Superintendent requesting that Mr. Raiford be referred to the State Medical Director for a workability evaluation to determine if he is able to perform the duties of his position. (ECF No. 53-10, at 4). On May 20, 2011, Kathryn Marr, Director of Human Resources with the Department of Juvenile Services, requested that Dr. Robert Toney, the State Medical Director, perform a workability evaluation of Gregory Raiford "to determine if he is able to continue to perform the duties of his classification. Mr. Raiford is a DJS Resident Advisor Trainee with the Department of Juvenile Services' Cheltenham Youth Facility." (ECF No. 53-12, at 3). Plaintiff was informed on May 12, 2011 that the Department had requested that he be referred to the State Medical Director for a workability evaluation to determine his ability to perform the essential duties of his position as a Resident Advisor Trainee. (ECF No. 53-13, at 1). The letter to Mr. Raiford also stated, in relevant part:

> Additionally, attached is a position description of your current essential job duties, the Department requests that your physician please determine your ability to perform the essential functions of the job. Based on his or her assessment the Department will consider possible temporary accommodations needed for your return to work as soon as possible, e.g., part-time, modified or light duty.

4

(*Id*. at 2).   On May 13, 2011, Dr. Weeks sent correspondence stating that Mr. Raiford was evaluated on May 13, 2011 and recommending that he "continue with light duty with no running, no prolonged standing, and refrain from any steps[.] . . . Mr. Raiford is also to refrain from involvement in ending any altercations."   (ECF No. 53-14, at 3).   More facts will be provided in the analysis section below.

After reviewing the documentation provided by Plaintiff and the Department of Juvenile Services and examining Mr. Raiford, Dr. Toney provided to Defendants his complete workability evaluation.   Specifically, on May 25, 2011, Dr. Toney sent the results of his workability evaluation, stating, *inter alia*:

> Based on the above information, it is my impression that Mr. Raiford is unable to perform the essential duties of his position at this time with or without reasonable accommodations.   I have reviewed the task analysis sheet and the job description for a Resident Advisor.
>
> It is my impression that Mr. Raiford is likely at or near maximum medical improvement.   Based on the duration of his symptoms, it is my impression that he will not likely be able to perform the essential duties of his position with or without reasonable accommodations in the foreseeable future.   The agency is therefore advised to take appropriate administrative actions in terms of his employment status as a Resident Advisor Trainee.

(ECF No. 53-16, at 4).

After receiving the workability evaluation from Dr. Toney, the Department of Juvenile Services sent a letter to Plaintiff on May 31, 2011 informing him regarding the results of the evaluation and his options. (*See* ECF No. 53-17). Specifically, Plaintiff was advised that he may: resign; explore other vacant positions within the Department of Juvenile Services; participate in the career assessment and development segment of the Division of Rehabilitation Services (DORS) program; or participate in the Career Reinvestment Program. (*Id.* at 2-3). Plaintiff was instructed to inform the Department regarding his choice by June 19, 2011.

On June 2, 2011, the Department sent additional correspondence to Mr. Raiford informing him that the following accommodations were considered but rejected: (1) job restructuring (changing how and when the essential functions of your position are performed)[;] (2) Reassignment (to a vacant position within the Department)[;] (3) Work from home[.]" (ECF No. 53-18, at 1). The letter explained that "[t]hese accommodations have been rejected because they will not allow you to perform the duties and responsibilities of a DJS Resident Advisor Trainee in a manner that would meet the needs of the Department. Robert H. Toney, M.D. also indicated you will not likely be able to perform the essential duties in the

*foreseeable future.*"   (*Id.* at 2).   Plaintiff further was advised:

> If you would like the Department to consider any other reasonable accommodations[] for your disabling condition, that you believe will enable you to perform the essential job functions of your DJS Resident Advisor Trainee position, please submit [to] William Wilson, Superintendent, Cheltenham Youth Facility, in writing, the specific accommodations for consideration ***no later than ten (10) workdays from receipt of this letter.*** For your convenience, the physical requirements pertaining to the essential functions of the DJS Resident Advisor Trainee position are noted on the attached Task Analysis Sheet.

(*Id.*) (emphasis in original).

On June 13, 2011, Plaintiff submitted correspondence to Superintendent Wilson, stating that he will resign as a Resident Advisor Trainee effective July 1, 2011.   (ECF No. 53-19). Plaintiff further stated: "In reference to letters dated May 31, 2011 and June 2, 2011, I have filed with the Maryland State Retirement Agency for accident disability.  I have already filed paperwork with Roslyn Jennings, Retirement Coordinator, State Disability Department and pursued other options presented to me." (*Id.*).

On June 9, 2011, under Mr. Raiford's signature and at his request, the Department of Juvenile Services submitted an application for disability retirement to the Maryland State Retirement Agency ("MSRA").   (ECF No. 53-20).  The application

authorized the MSRA to obtain all medical records, including workability evaluations, examinations by the State Medical Director, and medical documents and reports.   (*Id.* at 3). Notably, Plaintiff signed an acknowledgement that if he were to be approved for disability retirement, he would "be considered disabled and no longer qualified to continue in [his] current position."   (*Id.* at 4).   On November 15, 2011, Plaintiff received correspondence from the Disability Unit Supervisor informing him that the Board of Trustees accepted the Medical Board's recommendation that he be approved for accidental disability retirement.  (ECF No. 53-21).

### B. Procedural Background

Plaintiff initially brought a complaint against the Maryland Department of Juvenile Services alleging violations of the Americans with Disabilities Act ("ADA").   After Plaintiff amended his complaint and the Maryland Department of Juvenile Services moved to dismiss, Plaintiff sought to file a second amended complaint to add a new defendant, Sam J. Abed, the Secretary of the Department of Juvenile Services, in his official and individual capacity, and a new claim under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, premised on the same allegations as the ADA claim.   Plaintiff's motion to file a second amended complaint was granted in part by memorandum opinion and order issued on August 28, 2014.   (ECF

Nos. 40 & 41). For the reasons explained in the opinion, Plaintiff was permitted to file a second amended complaint to plead an ADA claim only against Secretary Abed in his official capacity and for prospective equitable relief only for acts that occurred between June 15, 2011 and April 10, 2012. Plaintiff also was permitted to plead a Rehabilitation Act claim, seeking both compensatory and prospective equitable relief from either the Department of Juvenile Services or Secretary Abed in his official capacity.

Subsequently, Plaintiff filed a second amended complaint. (ECF No. 48). Defendants moved for summary judgment on December 12, 2014. (ECF No. 53). Plaintiff opposed the motion (ECF No. 60), and Defendants replied (ECF No. 63).

## II.  Standard of Review

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). Once a properly supported motion for summary judgment is filed, the nonmoving party is required to make a sufficient showing on an essential element of that party's claim as to which that party would have the burden of proof to avoid summary judgment. *Celotex,* 477 U.S. at 322–23.

Summary judgment is appropriate under Federal Rule of Civil Procedure Rule 56(a) when there is no genuine dispute as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law.  In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249 (1986), the Supreme Court explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented."  *Id.* at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005).  The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not

sufficient to preclude an order granting summary judgment. *See Anderson,* 477 U.S. at 252.

A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted). Indeed, this court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt,* 999 F.2d 774, 778-79 (4th Cir. 1993) (*quoting Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987)).

## III. Analysis

### A.   Rehabilitation Act

Plaintiff asserts that Defendants refused to make reasonable accommodations "for the injuries Plaintiff incurred during the course of his employment" and purportedly "removed Plaintiff from his position as a Resident Advisor" after refusing to accommodate him. (ECF No. 48, at 5-6).

### 1.   Failure to Accommodate

The Rehabilitation Act prohibits discrimination against an otherwise qualified individual on the basis of a disability. Section 504 of the Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, . . . be subjected to discrimination under any program or activity receiving Federal financial

11

assistance."  29 U.S.C. § 794.  A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Nanette v. Snow*, 343 F.Supp.2d 465, 472 (D.Md. 2004) (*quoting* 42 U.S.C. § 12111(8)). "Employment discrimination claims brought under Section 504 are evaluated using the same standards as those 'applied under [T]itle I of the Americans with Disabilities Act of 1990'" *Reyazuddin v. Montgomery County, Maryland*, ---F.3d----, 2015 WL 3651710, at *5 (4th Cir. 2015) (*quoting* 29 U.S.C. § 794(d)).  To establish a claim under the Rehabilitation Act for failure to accommodate, a plaintiff must show that: (1) he suffers a disability; (2) his employer had notice of the disability; (3) with reasonable accommodations, he is otherwise qualified to perform the employment position in question; and (4) his employer refused to make such reasonable accommodations. *See Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013).

Defendants argue that Plaintiff cannot establish that he was able to perform the essential functions of the Resident Advisor Trainee position with or without a reasonable accommodation.  (ECF No. 53-1, at 11-12).  The "essential functions" include "functions that bear more than a marginal relationship to the job at issue." *Tyndall v. Nat'l Educ.*

12

*Ctrs.*, Inc., 31 F.3d 209, 213 (4th Cir. 1994) (*quoting Chandler v. City of Dallas*, 2 F.3d 1385, 1393-94 (5th Cir. 1993)).  "A job function may be considered essential for any of several reasons, including . . . [that] the reason the position exists is to perform that function."  29 C.F.R. § 1630.2(n)(2)(i).  To determine whether a particular job function is essential, the court may look to the employer's judgment as to which functions are essential, written job descriptions prepared before interviewing applicants for the job, and the work experience of past employees in the position or similar positions.  *Id.* § 1630.2(n)(3); 42 U.S.C. § 12111(8).  Plaintiff "bears the burden of establishing his ability to perform the essential functions of his job with a reasonable accommodation."  *Fleetwood v. Harford Sys., Inc.*, 380 F.Supp.2d 688, 697 (D.Md. 2005) (*citing Tyndall*, 31 F.3d at 213).

Philip Deitchman, the Director of Human Resources with the Department of Juvenile Services, submitted a sworn affidavit, explaining:

> There are three "classes" of DJS RAs in the State personnel system – RA Trainee, RA I, and RA II – and they are, as reflected in the attached Classification Specifications of the Department of Budget and Management's ("DBM") Division of Classification and Salary, essentially the same job, as they are only "differentiated on the basis of supervisory control exercised by the supervisor over [them]."

(ECF No. 53-2 ¶ 2).[1]   Defendants submit as an exhibit a Task

Analysis Sheet for the Resident Advisor position, which they

provided to Dr. Toney in performing his workability evaluation

and which indicates that the main purpose of the job is to

"maintain safety and security by direct supervision of juvenile

delinquent youth housed in a state operated Detention Center."

(ECF No. 53-10, at 9).   This "Task Analysis Sheet" provided by

Defendants indicates the following essential job duties for a

Resident Advisor: (1) supervise youth daily activities; (2)

defusing verbal and physical situations; (3) writing behavior,

incident or informational reports as needed; (4) documenting

---

[1] Defendants have provided a detailed description of the
Resident Advisor Trainee class specification, along with class
specifications for a Resident Advisor I and Resident Advisor II.
All three position classifications indicate that the three
positions are "differentiated on the basis of supervisory
control exercised by the supervisor over these employees." (ECF
Nos. 53-3, 54-4, and 53-5).   The position classifications
further elaborate:

> The DJS Resident Advisor Trainee learns to
> perform duties under close supervision, the
> DJS Resident Advisor I performs duties under
> close supervision until fully certified by
> the Maryland Correctional Training
> Commission.   Following certification, the
> DJS Resident Advisor I performs a limited
> range of duties with some independence at
> times and under close supervision at other
> times, depending on the complexity of the
> specific duty being performed.   The DJS
> Resident Advisor II performs the full range
> of duties under general supervision.

(ECF No. 53-4, at 1).

youth daily activities and behavior in unit logbook; (5) supervising youth doing details; (6) escorting youth to routine and/or emergency off-ground medical appointments; (7) attending training as required by the Department of Juvenile Services; and (8) complying with regular and predictable attendance and professional presentation standards. (*Id.* at 9-11). Defendants also submit a position description for a Resident Advisor II (which, as indicated above, differs from a Resident Advisor Trainee only on the basis of supervisory control), which identifies, *inter alia*, the following essential job functions and other assigned duties and allocates a percentage of time spent on the task and/or its weight of importance: (1) supervising youth daily activities (escort to school, recreational activities, meals, personal hygiene) (45%); (2) supervising youth movement both inside and outside the unit in order to maintain the safety and security of the youth (10%); (3) supervising youth doing details, which is accomplished by following a daily cleaning schedule including mopping, waxing, and/or buffing floors, cleaning and sanitizing bathroom, properly making beds, etc. (5%); and (4) defusing verbal and physical situations, accomplished by either verbal counseling or use of crisis intervention techniques (5%). (*Id.* at 16-17).

Plaintiff has not offered any evidence that he could perform the essential functions of the Resident Advisor Trainee

position without an accommodation.   The Resident Advisor Trainee position entails direct supervision of youth.   Plaintiff's only requested accommodation was to be assigned permanently to a modified duty position outside of the facility, which involves *no* interaction with youth.   (*See* ECF No. 48 ¶ 10 ("After the injury and until his surgery, Plaintiff was placed on a modified duty in the gate house and the special duty post, both of which were outside the facility, with no contact with juveniles."); *see also* ¶ 17 ("Modified duty positions were still available at the gate house and the special duty post outside the facility but Defendant[s] did not accommodate Plaintiff's request that he be assigned to those modified-duty positions.")).   Dr. Toney concluded after the workability evaluation that based on the duration of Plaintiff's symptoms, "he will not likely be able to perform the essential duties of his position with or without reasonable accommodations in the foreseeable future."   (ECF No. 53-16, at 4).   As Defendants argue, were they to accommodate Plaintiff by assigning him to a modified duty position, "it would have effectively eliminated the undisputed essential function of the RA Trainee position to provide direct care and supervision to youth."   (ECF No. 53-1, at 14).

In response to Defendants' arguments that Plaintiff has not established that he could perform the essential functions of his position, Plaintiff asserts:

16

> In regards to [] Defendant[s'] argument
> that [] Plaintiff cannot establish a claim
> under the Rehabilitation Act because []
> Plaintiff has to show that he was able to
> perform the essential functions of the
> Resident Advisor Trainee position with or
> without reasonable accommodations, this
> fails.   [] Defendant[s] do[] not []
> demonstrate that they gave [] Plaintiff
> reasonable accommodations, which included
> reassignment to a vacant position.   They
> fail to show that there was no reasonable
> accommodation available[.] . . .   At best,
> they merely argue that [] Plaintiff could
> not complete the position for which he was
> hired.  [Defendants] do[] not [] argue that
> there was a hardship by reassigning []
> Plaintiff to a position that he was
> qualified to do, or that they even tried to
> reassign him.   In light of the same, there
> remains a genuine issue in dispute.

(ECF No. 60, at 7).  Plaintiff's arguments are misguided and

reflect a misunderstanding of the applicable law.   The

Rehabilitation Act requires agencies to provide "reasonable

accommodations" to a disabled employee who could perform a job's

essential functions with such accommodations, unless the

provision of accommodations would place an "undue hardship" on

the agency.   42 U.S.C. § 12112(b)(5)(A).   "Reasonable

accommodations" are "[m]odifications or adjustments to the work

environment, or to the manner or circumstances under which the

position held or desired is customarily performed, that enable a

qualified individual with a disability to perform the essential

functions of that position."   29 C.F.R. § 1630.2(o)(1)(ii).

Title I of the ADA provides that a "reasonable accommodation" includes:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodation for individuals with disabilities.

42 U.S.C. § 12111(9).

Plaintiff has provided no evidence that reassignment to the modified duty position permanently would enable him to perform the essential functions of the Resident Advisor Trainee position, which entails supervising youth. *See, e.g., Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 581 (4th Cir. 2015) ("An employer is not required to grant even a reasonable accommodation unless it would enable the employee to perform *all* of the essential functions of [his] position." (emphasis in original)); *Wilson*, 717 F.3d at 346 ("Here, Wilson has not identified a possible reasonable accommodation, other than leave, that would have enabled him to perform the essential functions of his position; nor has Wilson produced evidence that had he been granted such leave, he could have performed the essential functions of his position[.]"). The analysis in

18

*Lapier v. Prince George's County, Md.*, Civ. Action No. 10-CV-2851 AW, 2013 WL 497971, at *4 (D.Md. Feb. 7, 2013), applies here:

> The next question is whether Plaintiff could have performed the functions of a police officer with a reasonable accommodation. . . . Here, Plaintiff completely fails to argue in his opposition that he could have performed the essential functions of the job with a reasonable accommodation. . . . Although Plaintiff references a handful of doctor's letters stating that his blood condition did not prevent him from being a police officer, none of these documents even attempt[] to explain how a reasonable accommodation would have rendered Plaintiff sufficiently fit to perform his job duties. . . . *And although Plaintiff could argue that the County should have kept him on light duty permanently, this argument would fail because permanent, light-duty positions would effectively eliminate the essential functions of chasing suspects on foot and making forcible arrests*. . . . Accordingly, no reasonable juror could conclude that Plaintiff could have performed the essential functions of a police officer with a reasonable accommodation.

(emphasis added); *see also Domek v. Schafer*, Civ. No. CCB-07-1469, 2008 WL 2312730, at *5 (D.Md. May 29, 2008) ("The Rehabilitation Act does not require that an employer eliminate essential job functions in order to accommodate a disabled employee."); *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F.App'x 314, 323 (4th Cir. 2011) ("Here, the district court correctly concluded that the ADA does not require an employer to

reallocate essential job functions or assign an employee 'permanent light duty[.]'").

Moreover, although Plaintiff broadly asserts in the opposition to the motion for summary judgment that Defendants failed to provide a reasonable accommodation by refusing to assign him to a vacant position, he provides no *evidence* that any vacant positions existed at the time.[2]   Judge Bennett's analysis in *Fields v. Clifton T. Perkins Hosp.*, Civ. Action No. RDB-12-3254, 2014 WL 2802986, at *5 (D.Md. June 19, 2014), is instructive on this point:

> After discovery in this case, the Plaintiff has not adduced sufficient evidence to show that assigning him to the North Side of the Hospital was a reasonable accommodation.  Although he states that the Hospital had assigned certain other employees to lighter duty positions on the North Side, the Plaintiff has not shown that any such positions were available at the relevant time, or why creating a new position would have been reasonable.  Ms. Beverly noted Fields's physician's opinion that he could only return to work with "restrictions that this facility [is] unable to accommodate."  . . .  Dr. Lyons concurred in this assessment. . . .  *Although the Plaintiff argues that Ms. Beverly should have been able to identify other positions to which he could have been transferred, his conclusory allegations in this regard are insufficient to create a genuine issue of*

---

[2]   Furthermore, Defendants have produced their "Managed Return to Work Program Policy Requirements and Procedures," which indicate, *inter alia*, that transition duty assignments are temporary, and "[u]nder no circumstances may a transitional duty assignment exceed 75 calendar days."  (ECF No. 53-23, at 13).

> *material fact as to whether such positions*
> *existed.  His identifying specific, isolated*
> *tasks he could have performed despite his*
> *physician's restrictions is not sufficient*
> *to show that the Hospital could have*
> *accommodated him by transferring him to a*
> *reasonably available alternative position.*

(emphasis added), *aff'd* ---F.App'x----, 2015 WL 3483034 (4th Cir. 2015).

Any suggestion from Plaintiff that Defendants failed to engage in the interactive process to find a reasonable accommodation for him is unavailing.  *See, e.g., Jacobs*, 780 F.3d at 581 ("[A]n employer will not be liable for failure to engage in the interactive process if the employee ultimately fails to demonstrate the existence of a reasonable accommodation that would allow [him] to perform the essential functions of the position.").  After Dr. Toney conducted the workability evaluation, Defendants sent correspondence to Plaintiff on June 2, 2011 informing him about the accommodations that have been rejected but allowing him an opportunity to propose specific accommodations for consideration.  (ECF No. 53-18, at 2).  Mr. Deitchman indicates in his sworn affidavit that "[a] review of Mr. Raiford's file evidences no communication from Mr. Raiford in response to the Department's invitation to submit additional potential accommodations for consideration."  (ECF No. 53-2 ¶4.P, Deitchman Aff.).

Based on the foregoing, Plaintiff has failed to raise a genuine dispute regarding whether he could perform the essential functions of his position with or without a reasonable accommodation. Accordingly, judgment will be entered in favor of Defendants on the failure to accommodate claim.

## 2. Constructive Discharge

Although Plaintiff fails explicitly to raise this claim in his second amended complaint, he appears to be arguing that the failure to accommodate resulted in a constructive discharge.

"In this circuit, the standard for constructive discharge requires a plaintiff to show both intolerable working conditions and a deliberate effort by the employer to force the employee to quit." *Johnson v. Shalala*, 991 F.2d 126, 131 (4th Cir. 1993).

> "Intolerability" is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign; presumably every resignation occurs because the employee believes that it is in his best interest to resign. Rather "[i]ntolerability . . . is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt *compelled* to resign," *Bristow [v. Daily Press, Inc.]*, 770 F.2d [1251,] 1255 [4th Cir. 1985] (emphasis added) — that is, whether he would have had *no choice* but to resign.

*Blistein v. St. John's Coll.*, 74 F.3d 1459, 1468 (4th Cir. 1996), *overruled on other grounds by Oubre v. Entergy Operations, Inc.*, 522 U.S. 422 (1998) (emphasis in original).

Deliberateness can be shown "by actual evidence of intent by the employer to drive the employee from the job, or circumstantial evidence of such intent, including a series of actions that single out a plaintiff for differential treatment. *Johnson*, 991 F.2d at 131 (stating that the "fact that employees were treated identically rebuts any inference" of constructive discharge) (*citing Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir. 1981)).   "Because the claim of constructive discharge is so open to abuse by those who leave employment of their own accord, this Circuit has insisted that it be carefully cabined." *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 187 (4th Cir. 2004).   But the "traditional standard of constructive discharge . . . does not neatly translate to the context of the Rehabilitation Act. . . .  [T]he Rehabilitation Act demands more of [employers] than simple equality of treatment – the [employer] must affirmatively take steps to accommodate employees with handicaps, unless accommodation would impose undue hardship." *Johnson*, 991 F.2d at 131.   In *Johnson*, the Fourth Circuit considered the district court's decision that the employer's failure to accommodate affirmatively the employee's known disability constituted a constructive

23

discharge. The Fourth Circuit reversed, rejecting such a sweeping standard: "rather than cabining the doctrine of constructive discharge, the standard adopted by the district court threatens to convert every failure to accommodate under the Rehabilitation Act into a potential claim for constructive discharge." *Id.* Thus, to prevail, a plaintiff must show more than mere failure to accommodate; he "must present some evidence that the employer intentionally sought to drive her from her position." *Id.* at 132. In *Johnson* – at the summary judgment stage – the court found that the employer fully complied with the employee's accommodation requests in some instances, and at least partially complied with others. Her supervisors' "lack of flexibility or magnanimity" did not demonstrate a deliberate intent to force an employee from her job. *Id.*

Here, Plaintiff does not even come close to proving a constructive discharge claim. He has presented no evidence that the Department of Juvenile Services intentionally sought to drive him from the Resident Advisor Trainee position. As discussed above, Defendants gave Plaintiff several options after informing him of the results of Dr. Toney's evaluation. (*See* ECF No. 53-17). In response, Mr. Raiford submitted a letter to Defendants on June 13, 2011, informing them of his resignation and decision to pursue accident disability benefits. (*See* ECF No. 60-1, at 3); *see, e.g., Hill v. Verizon Maryland, Inc.*, Civ.

Action No. RDB-07-3123, 2009 WL 2060088, at *13 (D.Md. July 13, 2009) ("Verizon's actions against Hill do not approach the requisite level of deliberateness reflecting an attempt to induce resignation. . . . Plaintiff voluntarily retired before the wage decrease took effect, further undermining his argument that it left him unable to provide for his family. The evidence suggests that Mr. Hill left his employment of his 'own accord.'").

###    B.   ADA Claim

The August 28, 2014 opinion allowed Plaintiff to plead an ADA claim against Secretary Abed in his official capacity for prospective equitable relief only. (ECF No. 40, at 17). Plaintiff filed an EEO charge on April 10, 2012, thus only those acts that allegedly violated the ADA which occurred within 300 days of that date were timely filed. The August 28 opinion explained that only those acts that occurred between June 15, 2011 and April 10, 2012 are actionable as a failure to accommodate claim under the ADA against Secretary Abed in his official capacity. (*Id.* at 17-18).

Defendants argue that they "did not engage in any conduct relative to Plaintiff and his employment during the limitations period identified by the Court[,]" except to recognize Plaintiff's June 13, 2011 resignation as effective on July 1, 2011." (ECF No. 53-1, at 10). Although Plaintiff's arguments

in the opposition memorandum are a far cry from a model of clarity, he appears to be arguing that he was constructively discharged during this time period.  As explained, Plaintiff has not established a constructive discharge claim.  In any event, Plaintiff fails to establish a failure to accommodate claim under the ADA for the same reasons set forth above.

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment will be granted.  A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge